Filed 12/29/21  In re A.L. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re A.L., et al., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>        Petitioner and Respondent,<br><br>v.<br><br>M.H.,<br><br>        Objector and Appellant. | A162200<br><br>(Sonoma County Super. Ct. Nos. DEP 5728, DEP 5729) |

M.H. (Mother), the mother of Al. and An., appeals after the juvenile court denied her oral motion for modification seeking return of the children to her care (Welf. & Inst. Code[1], § 388), terminated her parental rights, and selected adoption as the children's permanent plan (§ 366.26).  On appeal, Mother argues that the court erred by denying her section 388 motion, finding that she failed to establish the beneficial relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)), and failing to ensure proper compliance with the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA).  The Sonoma

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

County Human Services Department (the Department) concedes error with respect to the latter two issues.

We reject Mother's contention that the juvenile court erred in denying her section 388 motion.  However, after the court issued its section 366.26 order, the California Supreme Court decided *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), which provided new guidance on how the beneficial relationship exception should be applied.  We cannot determine on the record before us that the juvenile court's ruling complied with the principles announced in *Caden C.*  We also agree with the parties that the record does not support the juvenile court's ICWA findings.  Accordingly, we affirm the order denying the section 388 petition, but reverse the section 366.26 order and remand with directions.

## BACKGROUND
*The Initial Dependency Proceeding*

In December 2018, the Department filed a petition under section 300 for Al. and An., then six and three years old, respectively.  The petition alleged the children were at risk of serious harm because Mother and Father engaged in physical violence with Al. in the zone of danger (§ 300, subd. (a)), and Mother and Father exposed the children to domestic violence on at least eight occasions (§ 300, subd. (b)).  Under section 300, subdivision (g), the petition stated Father was incarcerated and unable to provide care and support.  The petition also alleged that Mother received a criminal protective order (the protective

order) against Father in November 2018, and police arrested Father for violations of this order numerous times.

The Department's report in support of the petition summarized nine reports of domestic violence between Mother and Father or violations of domestic violence protective orders, dating back to August 2016. When confronted with the seriousness of the situation, Mother said she would be willing to move to another home or into a domestic violence shelter to protect the children. The children were detained.

The Department filed an amended section 300 petition in January 2019 including an allegation under subdivision (c) that the children were at risk of suffering serious emotional damage based on domestic violence. The subdivision (a) and subdivision (b) allegations were amended to state there had been nine incidents of serious domestic violence in the prior two and a half years, there was a chronic pattern of violence, and Mother failed to protect the children by continuing to allow Father to visit the children and not pressing charges.

In its jurisdiction/disposition report, the Department recommended the court take jurisdiction, declare the children dependents, and order family reunification services for the parents. The children had been placed with Mother's cousin and were doing well. Mother denied being in a relationship with Father and said Father was repeatedly violent with her in the children's presence. Mother had always been a stay-at-home mother. She had adult children with whom she had no child protective history. Mother had anxiety and ADHD. She was

willing to participate in services, "expressed a strong desire to reunify," and spoke passionately about her love for her children. Father denied harming anyone and accused Mother of hurting the children and using drugs.

At the February 2019 contested jurisdiction/disposition hearing, the court found the allegations of the amended petition to be true and removed the children. Father was declared the presumed father, and Mother and Father were offered reunification services. Mother's case plan included parenting education, domestic violence support groups, intake assessment with DAAC (Drug Abuse Alternatives Center), completing an inpatient or outpatient program as assessed, and submitting to random drug tests.

The Department's August 2019 six-month status report recommended an additional six months of services for Mother, and termination of services for Father, who had not made efforts to contact the Department since January 2019. Al. was "very happy, resilient, and well-adjusted," with no behavioral issues. An. was very quiet and reserved, but had normal development. Al. wanted to be back home with Mother, and An. "enthusiastically agreed." Al. and An. felt safe with Mother, spoke highly of their time with her, and could not wait to spend time with her again.

Mother's visitation had been consistent, visitation became unsupervised, and overnight visits began in July 2019. The interactions between Mother and the children were consistently appropriate and positive. Mother was engaged in her case plan,

including the requirement that she learn to build and maintain safe and healthy relationships free of violence. Mother successfully completed a six-week YWCA domestic violence program, continued to attend group meetings, and engaged in therapy. Mother completed an assessment with DAAC in May 2019 which determined there was no need for inpatient or outpatient services. Mother's drug tests were negative, although she missed several tests. The social worker noted that Mother never appeared to be under the influence, and she did not suspect that Mother was actively using substances. Father was incarcerated during much of the review period, and, to the social worker's knowledge, Mother had not had contact with him. The social worker reported growth in Mother's confidence, and that Mother was loving and attentive during visits and made the children feel "confident, comfortable, and safe."

At the six-month review hearing, the juvenile court authorized a trial home visit, and Mother submitted to the Department's recommendation. Mother's updated case plan included refraining from contact with Father and adhering to the protective order, developing a written safety plan specifying whom she would contact in the event she or the girls were in a violent or threatening situation with Father, and ensuring that all relationships to which the children were exposed were safe and free of violence. At the subsequent November 2019 contested six-month review hearing set by Father, the court terminated his reunification services.

As of the Department's January 2020 12-month status report, the children had been on a trial home visit with Mother for several months. Al. was happy and had no concerns living with Mother, and An. appeared happy and well-adjusted. Mother had made significant progress creating healthy relationships, but there were still serious concerns about her ability to follow through with some of her children's needs. Al. had missed forty percent of the school year since being on the home trial visit, and Mother failed to maintain adequate contact with services providers, the social worker, and Al.'s school. Mother's case plan continued to require her to provide a safe and violence-free home by, among other things, refraining from contact with Father, abiding by the protective order, and ensuring that all relationships to which the children were exposed were safe and free of violence. The Department recommended family maintenance services for Mother, and, at the March 2020 twelve-month review hearing, the court accepted this recommendation.

*The Section 387 Motion and Setting of the Section 366.26 Hearing*

On June 11, 2020, the Department filed a section 387 petition alleging that Mother had engaged in verbal and physical altercations in the home with her boyfriend in the children's presence, and she had been arrested for felony aggravated assault. Mother also allowed the children to be in Father's care, despite the fact that he was allowed only Department-supervised visits, and she coached the children not to tell the Department. The children were placed back in the care of Mother's cousin.

6

The Department reported the children knew about the violent incident with Mother and her boyfriend, but said they did not see it; they said Mother and her boyfriend argued, screamed, and yelled in the home, daily. Al. seemed to believe that verbal and physical arguments were normal. The police had been called to the home multiple times in the preceding months for concerns of violence, including for an incident in April 2020 where Father and Mother were outside the home arguing. The Department reported concern that Mother had been falsifying drug tests, and Mother's then-current appearance indicated substance abuse.

The court found a prima facie case had been made, and, after a subsequent contested hearing, sustained the section 387 petition. The court approved the children's placement with the maternal cousin. Because there was not a substantial probability of return within the next six months or the time that remained in the 18-month maximum reunification period, the court terminated Mother's reunification services. The matter was set for a section 366.26 hearing.

*Proceedings After Setting of the Section 366.26 Hearing*

The Department's November 2020 section 366.26 report recommended parental rights be terminated, and a plan of adoption be ordered.

Mother's visits with the children initially went well after the June 2020 removal, at which time Mother had been approved for three visits a week, supervised by the caregiver. When visits began, the children had a hard time leaving Mother. In July 2020, the caregiver reported some difficulty in contacting Mother,

visits the following month occurred only when the caregiver could pick Mother up, and visits became more infrequent when the caregiver started having car problems. In October 2020, Mother went car shopping and then missed visits after obtaining a car. The caregiver did not tell the children about visits so they would not be disappointed if Mother did not show, and she reported the children no longer struggled at the end of visits. They did not ask to see or visit with Mother when she did not visit.

Al. and An. had lived in the potential adoptive home, the home of the maternal cousin, for thirteen months in total during the dependency, and neither child had developmental, behavioral, or health concerns. Al. called the maternal cousin her "Aunt." Al. responded positively when asked whether she could see herself growing up with her aunt, and she demonstrated an understanding of adoption and a desire to grow up with her aunt. The social worker reported that Al. perceived her potential adoptive mother as her primary caregiver, and the caregiver was meeting Al.'s physical and emotional needs. An. was too young to be interviewed, but the social worker observed that An. saw her caregivers, and in some ways her older sister, as her primary caregivers, and they were meeting her physical and emotional needs.

The relative caregivers were committed to the children and willing to provide permanency through adoption. They were experienced parents who had demonstrated good parenting practices and the ability to meet the children's needs. The girls had always had the caregivers in their lives, and they were

comfortable with the family.  Both children demonstrated strong emotional ties to the potential adoptive family.  The social worker also reported that the potential adoptive parents and Mother were committed to maintaining the relationship between Mother and the children if it was in the children's best interests, and the potential adoptive family had been referred to services to mediate a possible agreement for contact under the Family Code.

The section 366.26 report concluded that both children would benefit from a permanent plan of adoption.  The report documented an assessment by Sonoma County Family, Youth & Children's Services (FY&C), stating, "Although interaction between the children and the birth parents may have some incidental benefit, such benefit does not outweigh the benefit that will be gained through the permanence of adoption.  FY&C assesses that termination of parental rights would not be detrimental to the [children]."

In advance of the section 366.26 hearing, the Department provided the court with a copy of a police report from a December 26, 2020 incident involving domestic violence between Mother and Father.  In the report, Mother said Father broke into her home and was standing over her when she awoke; her son, who heard Mother screaming, reported that she told him to call the police.  Father told police Mother battered him, and he visited the house every once in a while.  Father was arrested for domestic battery and violation of the protective order.  The police report also included a statement from Mother's son that Father "comes

9

to the house about once a week and stays for about an hour at a time."

The court held a virtual contested section 366.26 hearing on January 8, 2021 that concluded on January 11, 2021. The Department's section 366.26 report and witness disclosure, which included the December 26, 2020 police report, were moved into evidence. The court stated it had read and reviewed the entire file, including the protective order from November 2018, and it took judicial notice of its file.[2]

Mother's counsel made an oral motion under section 388 asking for return of the children because Mother had maintained suitable housing, she was not in a relationship with her prior boyfriend, she enjoyed frequent visits with the children, she believed the girls wanted to return to her care, and she had a close relationship with the girls. The court stated it would take the motion under submission, and then heard testimony from Mother and a social worker.

Mother testified that she could provide a safe home for her daughters. She had lived in a three-bedroom house with her adult son since February 2019. Mother said that she called the police in December 2020 after Father came to her house in violation of the protective order. Father appeared at her house

---

[2] The day before the section 366.26 hearing, Father filed a section 388 petition asking that the children be returned to him or for additional reunification services, and Father testified at the hearing regarding the services he had completed. The court's denial of Father's section 388 petition is not at issue in this appeal.

10

with presents for the kids around Christmas, and she told him to leave. He appeared again the next morning, this time in her home, and she called the police because she had learned no tolerance. Mother testified that the statement in the police report indicating Father had been coming over to her home about once a week was false. She then qualified that Father had been there "a few times" prior. Mother testified that she had participated in parenting classes, was engaging in counseling to address her ADHD and PTSD, and was taking prescribed medications. Mother was willing to check in with the social worker and to be monitored.

Regarding visitation, Mother stated she visited with the girls "a few times a week for a few hours and one day on the weekend." Mother testified that she had a "really close" relationship with Al., that they were "best friends," and Al. "most definitely" viewed her as her mother. Mother had the closest relationship with An., who was her "sidekick and [ ] shadow." Mother said she had not missed visits with Al. and An.; some visits had been rescheduled, but not missed. Mother believed terminating her parental rights would have a "devastating effect" on her children, and they would be "traumatized severely." She said that the "absence of a mother is just not being complete ever," and there would "always be something missing from their lives." Mother testified that An. was hurting without Mother, she had begun peeing in her pants after the June 2020 removal, and Al. told her An. cries for Mother at night.

11

The social worker testified that the caregiver stated that visitation had been difficult. The caregiver brought the children to visits, and if the caregiver's car was not working, visits did not occur. However, the social worker conceded that, in the weeks prior to the hearing, visits had resumed at multiple times per week. The social worker stated that the children "respond fine for the most part" after visits; they did not cry or ask for Mother. The caregiver reported that the children do not ask about Mother, and if the caregiver did not talk about visits, the children did not ask for visits. The caregiver supervised the visits between the children and Mother, and the social worker had not observed any visit. An.'s enuresis had resumed at visits or immediately after visits with Mother.

The social worker testified that Al., who was old enough to be asked about the prospects of adoption, told the social worker that she wanted to grow up with her caregiver, and she liked where she was living. Al. did not say she wanted to live with Mother. The social worker opined that termination of parental rights would not be detrimental to the children, and the children depended on the caregiver as their primary parental figure.

*The Juvenile Court's Ruling*

On the first day of the hearing, the court denied the section 388 petitions of Mother and Father, stating, "Both of you seem to be doing well. And you are in the process of changing your lives. This particular petition is somewhat difficult for a parent to prevail because they have to show that their circumstances have been totally and completely changed. [¶] Both [Mother] and

[Father] are in the process of changing their lives . . . [¶] I'm going to deny the JV-180s for both. They do not show changed circumstances to the extent that would be necessary. And there is no showing that it would be in the best interest of the children at this time, based on those two prongs."

The court then turned to the section 366.26 issues. The court observed that reunification services had been terminated over a year prior for Father and over six months prior for Mother, and the children needed stability. It found by clear and convincing evidence that the children were generally and specifically adoptable and stated the permanent plan was adoption. Regarding the beneficial relationship exception, the court ruled Mother "tried her best and has maintained reasonable visitation with her children." However, neither parent had "prove[n] by a preponderance of the evidence that the children would benefit from continuing the parental relationship to such a degree that terminating parental rights would be detrimental to the child. That has not been shown by any evidence in this hearing." The court continued, "So with that I am going to note that mother, once she had – once she exposed the children to domestic violence back last year, mid—in her relationship around the middle of last year, that at the end of this last year she was allowing [Father] in the house based on the information that was – I know that this is not her testimony, but the information contained in the reports, including the testimony of other children, show that [Father] was coming over there at least once a week even though there was a criminal protective

13

order, and at one point [Father], though it did not result in a conviction, was arrested for domestic violence and he has – has testified so. [¶] So based on all of that information, the parental rights are terminated." Mother timely appealed from the court's January 11, 2021 order.[3]

## DISCUSSION

### I. Denial of Mother's Section 388 Motion

Mother contends that the trial court abused its discretion in denying her section 388 request by requiring a showing of circumstances that had "totally and completely" changed, rather than the pertinent substantial change standard. (See *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1061 ["A decision that rests on an error of law constitutes an abuse of discretion"].) She also contends that the court abused its discretion when it determined that she had not established that return of the children would be in their best interests. We need not decide whether the juvenile court used an incorrect standard to evaluate Mother's changed circumstances showing because we find no merit to Mother's second contention.[4]

---

[3] Mother's counsel filed a notice of appeal for her on March 9, 2021, and Mother filed what is designated in the record as a "duplicate notice" on March 11, 2021.

[4] Mother's notices of appeal designate an appeal from a January 11, 2021 order under "Section 366.26." Her duplicate notice indicates an appeal from "January 11, 2021. Order of termination of parental rights, planned permanency placement," and from an order in June 2020 under "Section 360," "Removal of custody from parent or guardian." These notices do not specify the section 388 order. The court in *In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450–1451, explained that it routinely

14

Section 388 authorizes a parent to petition the court to change a previous order based on a change in circumstances or new evidence if undoing the prior order would be in the child's best interests. (§ 388, subds. (a)(1), (d); *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526–527 & fn. 5, 529 (*Kimberly F.*).) The parent bears the burden to establish a genuine change of circumstances, and that undoing the prior order would be in the best interests of the child. (*Kimberly F.*, at p. 529.) Section 388 serves as "an 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*Id.* at p. 528.) In this respect, it is "vital to the *constitutionality* of our dependency scheme as a whole, and the termination statute, section 366.26, in particular." (*Ibid.,* citing *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).)

Nonetheless, after reunification services have been terminated and a section 366.26 hearing has been set, as in this case, "the parent['s] interest in the care, custody and companionship of the child are no longer paramount. Rather, at

deemed notices of appeal from termination of parental rights to include denials of section 388 petitions filed within 60 days prior. *In re J.F.* (2019) 39 Cal.App.5th 70, 77–78, declined to follow *Madison W.* where the court denied a section 388 petition 44 days before the termination of parental rights and appellant's briefing addressed only the 388 petition. We will follow *Madison W.* here and liberally construe the notices of appeal because Mother made her section 388 motion on the day of the section 366.26 hearing, both parties' briefing addresses the sections 388 and 366.26 orders, and the Department does not argue the section 388 order was not appealed, nor does it assert any prejudice.

15

this point 'the focus shifts to the needs of the child for permanency and stability' ([*Marilyn H.*, *supra*, Cal.4th at p. 309]), and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) "A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Ibid.*)

The determination of a section 388 motion is committed to the sound discretion of the juvenile court, which we do not disturb unless abuse of discretion is clearly established, that is, if the trial court " 'exceeded the bounds of reason.' " (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.) This is a high standard, and an order denying a section 388 motion is rarely reversed. (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.) If the facts are susceptible to more than one inference, we may not substitute our inference for that of the trial court. (*Stephanie M.*, at p. 319.)

Here, we find no abuse of discretion in the trial court's denial of Mother's last-minute section 388 request: Mother did not establish that the children's need for permanency and stability would be advanced by granting her motion. Mother testified that she was taking her medication, going to counseling, she was in contact with the YWCA, and she had stable housing. However, Mother ignores the juvenile court's salient finding that, towards the end of 2020, Mother was allowing Father to visit her on a weekly basis (ultimately culminating in Father's arrest for

16

domestic battery), despite the case history and the protective order. It is not the province of this court to reevaluate a witness's credibility. (*In re I.B.* (2020) 53 Cal.App.5th 133, 156 (*I.B.*).) Considering the evidence of Mother's recent inability to cut ties to Father, who visited in violation of the protective order, reasonable uncertainty existed that Mother would be successful in providing her children with a stable home and protecting them from domestic violence. Given the children's need for safety, stability, and a permanent home at this point in the process, the juvenile court did not abuse its discretion in deciding Mother had not sufficiently demonstrated it would be in the children's best interests to grant the section 388 request.

Mother's arguments to the contrary are unavailing. She contends recent authority supports the continued use of the factors in *Kimberly F.*, *supra*, 56 Cal.App.4th 519, to evaluate the child's best interests. (See *In re J.C.* (2014) 226 Cal.App.4th 503, 527 [declining to apply *Kimberly F.* factors because they did not take into account shift of focus to child's best interests and *Stephanie M.* rather than parent's efforts]; *I.B.*, *supra*, 53 Cal.App.5th at p. 163 [trial court did not abuse discretion by also considering *Kimberly F.* factors as part of "holistic evaluation" where mother established she could immediately provide permanent and stable home for her child; explaining *J.C.* declined to apply the factors because parent failed to address permanency and stability]; *In re J.M.* (2020) 50 Cal.App.5th 833, 847–851 (*J.M.*) [applying *Kimberly F.* factors].) Observing that courts may be tempted to simply compare the household and

17

upbringing provided by the parents with that of the caretakers, the *Kimberly F.* court listed factors courts should consider when assessing the minor's best interests on a petition for modification. (*Kimberly F.*, at pp. 529, 532.) These factors include the seriousness of the problem that led to the dependency; the strength of the relative bonds between the dependent children to both the parent and caretaker; and the degree to which the problem may be easily removed or ameliorated and the degree to which it actually has been. (*Id.* at p. 532.)

The evidence and findings from below establish that the *Kimberly F.* factors do not help Mother. The issues that brought Mother before the dependency court were serious. Mother and Father initially failed to protect the children from domestic violence, and Father placed the children at risk of physical harm. The section 387 petition occurred because of domestic violence between Mother and her boyfriend and because Mother allowed Father to visit her and the children without Department supervision, in violation of the protective order. Mother's counsel represented Mother had ended her relationship with her boyfriend. But the court found that Mother had been allowing Father to visit in violation of the protective order, and he was arrested at her home on December 26, 2020 for domestic battery. Mother thus had not remedied or shown that she was likely to remedy the serious problems underlying the dependencies. As to the strength of the children's bonds, the evidence established a strong bond with Mother, but it also showed a strong bond to the

18

caregiver, with whom Al. said she wanted to grow up, and who was meeting the children's emotional and physical needs.

Both *I.B.* and *J.M.*, upon which Mother relies, are distinguishable. In *J.M.*, domestic violence issues with the father served as the basis for the dependency petition (*J.M., supra*, 50 Cal.App.5th at p. 836), and in *I.B.*, exposure of the children to domestic violence between the mother and the father and an unsanitary home served as the basis for the dependency petition (*I.B.*, *supra*, 53 Cal.App.5th at pp. 136–137). As of the filing of the section 388 petitions in both cases, the mothers had ceased contact with the fathers for significant periods of time, and each had ameliorated the concerns that led to the dependencies. (*J.M.*, at pp. 836, 843, 845–849; *I.B.*, at p.157.) The cessation in contact with the fathers in both cases supported the courts' conclusions that the mothers could offer a safe, permanent, and stable home. (See *J.M.*, at pp. 848–849; *I.B.*, at p. 161.) That is not the case here.

We recognize the evidence shows that Mother loved her children, and she made progress by completing a domestic violence program, attending counseling, and taking her medication. But the focus at this stage is on the best interests of the children. Considering all relevant factors and the trial court's credibility findings, the court reasonably concluded the children's best interests would not be served by returning them to Mother.

## II. The Beneficial Relationship Exception

Mother next contends that the juvenile court incorrectly found the beneficial relationship exception inapplicable.

19

(§ 366.26, subd. (c)(1)(B)(i).) The Department concedes remand is required in light of our Supreme Court's recent guidance on this exception in *Caden C.* For the reasons set forth below, remand is required.

The purpose of the section 366.26 hearing is to select a permanent plan for the child after reunification efforts have failed. (§ 366.26, subd. (b); *Marilyn H., supra*, 5 Cal.4th at p. 304.) Adoption, where possible, is the permanent plan preferred by the Legislature for a dependent minor child who has not been returned to the custody of his or her parents and is found by the court to be adoptable. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) When the court finds that a child is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless "the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason." (*Caden C., supra*, 11 Cal.5th at p. 630.)

In *Caden C.*, the Supreme Court provided new guidance regarding the beneficial relationship exception to termination of parental rights. To apply this exception, a parent is required to show "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C., supra*, 11 Cal.5th at p. 631, italics omitted.) "The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court

orders.' " (*Id.* at p. 632.)  For the second element, "courts assess whether 'the child would benefit from continuing the relationship.' " (*Ibid.*)  "[T]he parent must show that the child has a substantial, positive, emotional attachment to the parent— the kind of attachment implying that the child would benefit from continuing the relationship." (*Id.* at p. 636.)  That relationship may be shaped by numerous factors, such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632.)  For the third element, the court decides whether it would harm the child to sever the relationship and choose adoption. (*Id.* at p. 633.)

On the third element, *Caden C.* provided additional guidance.  The court explained that, in conducting its analysis, the juvenile court must assume that terminating parental rights entirely terminates the relationship with the child.  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  "What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citation.] . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression [or] . . . a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental."

21

(*Ibid.*)  If severing the parent/child relationship would deprive the child of a substantial, positive emotional attachment such that termination would harm the child even considering the benefits of a new adoptive home, the court should not terminate parental rights.  (*Ibid*.)  Moreover, whether a parent is ready for a return of custody is not by itself relevant.  (*Id.* at p. 634.)  The court thus cannot compare the parent's attributes as a custodial caregiver to those of a potential adoptive family.  (*Ibid*.)

*Caden C.* also instructed on the relevance of the parent's continued struggles with the issues that led to the dependency, stating that such struggles "are not a categorical bar to applying the [beneficial parental relationship] exception."  (*Caden C.*, *supra*, 11 Cal.5th at p. 637.)  "Parents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception."  (*Ibid*.)  Nevertheless, the issues that led to the dependency may be relevant to the application of the exception, such as where there is a negative effect on the child.  (*Ibid*.)  But they are relevant only to the extent they inform whether the child would benefit from continuing the parental relationship and be harmed by losing it.  (*Id.* at 638.)

A substantial evidence standard of review applies to the juvenile court's findings on the first two elements of the beneficial relationship exception because these are factual determinations.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)  The third element is subject to a "hybrid" standard of review.  (*Id.* at p. 641.)  The court's factual determinations regarding, among other things, the

specific features of the child's relationship with the parent, the harm that would come from losing those specific features, and how the prospective adoptive placement may offset and even counterbalance those harms are reviewed for substantial evidence. (*Id.* at p. 640.) The court's "delicate balancing" of "the harm of losing the relationship against the benefits of placement in a new, adoptive home" is discretionary and properly reviewed for abuse of discretion. (*Ibid.*)

On the first element, the juvenile court here found that Mother maintained reasonable visitation, the Department agrees, and substantial evidence supports the finding. Mother's visitation in the early stages of the dependency was consistent. The social worker reported some difficulty in arranging visitation as a result of transportation challenges after the section 387 petition, but visits had returned to multiple times a week in the weeks leading to the section 366.26 hearing. Mother, in turn, testified that she had not missed visits and explained that any missed visits were rescheduled.

The juvenile court's findings with respect to the second and third elements are not as clear. Specifically as to these elements, the court stated, "[N]either parent has proved by a preponderance of the evidence that the children would benefit from continuing the parental relationship to such a degree that terminating the parental rights would be detrimental to the child." But the court also noted the incident of domestic violence with Mother's boyfriend, the recent evidence of Father visiting Mother in violation of the restraining order, and Father's

23

December 26, 2020 arrest. The court then concluded, "So based on all of that information, the parental rights are terminated."

In making these findings, the court seems to have impliedly found a benefit, and evidence of the children's age, the length of time they lived with Mother, and their interactions with her would support such a finding. Nonetheless, the court also expressly stated it based the termination of parental rights on Mother's ongoing struggles with domestic violence. The court had noted the children needed stability, and it is possible the court concluded that Mother's involvement in violent relationships meant that her interactions with the children had a negative impact. However, the children were not present for the more recent interactions between Mother and Father that the court mentioned, and there is no indication they knew of these incidents. Thus, it is not clear that the court did not improperly fault Mother for her ongoing struggles with domestic violence. (*Caden C., supra,* 11 Cal.5th at p. 637.) It is also unclear from the court's comments whether it considered Mother's lack of ability to provide a safe home for the children in making its decision. (*Id.* at p. 634.) Thus, we simply cannot be certain from this record that the court did not consider improper factors when assessing whether the beneficial relationship exception applied.

Given these ambiguities and the importance of the parental relationship, we deem it prudent to remand for reconsideration so that the trial court can make its findings with the benefit of *Caden C.*'s guidance. We recognize it is in the children's interest to expeditiously select a permanent plan, but we cannot

24

determine on the record before us that the court's ruling complied with *Caden C.*

## III. ICWA

Mother contends that the juvenile court's ICWA finding must be reversed because the Department did not adequately investigate the children's possible Indian ancestry. We agree.

### A. Relevant Background

At the December 2018 detention hearing, Father submitted an ICWA-020 form indicating he may have Cherokee ancestry on the paternal side from a great-great grandparent.[5] Father made a similar statement in a January 2019 interview with the Department. As a result, the Department's jurisdiction/disposition report states that "[t]he Department is engaged in research efforts around [Father's] ancestry."

On February 7, 2019, the Department sent ICWA-030 notices to the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians. The notices included Father's information, listing "Cherokee Tribes" thereunder, but they did not contain information about Father's relatives. The Eastern Band of Cherokee Indians and the Cherokee Nation responded that the children were not eligible for membership.

---

[5] Mother also submitted an ICWA-020 form stating she may have Native American ancestry. Mother does not challenge the Department's handling of her potential Native American ancestry or the court's findings under ICWA with respect to Mother, so we do not discuss the facts underlying the Department's ICWA efforts as to Mother.

The court's ICWA findings after the February 28, 2019 contested jurisdiction/disposition hearing stated: "The court and Department properly inquired of the mother, [M.H.], whether the children might be Indian children under [ICWA], provided said party with Notification of Indian Status (Juvenile Court) (ICWA-020) and ordered the party to complete form ICWA-020 and to submit it to the court before leaving the courthouse today. The court orders the Department to conduct additional inquiry and notice, if necessary, to comply with the Act."

The Department's six-month review report indicated that the Eastern Band of Cherokee Indians and the Cherokee Nation had responded that the children were not eligible for membership, but the United Keetoowah Band of Cherokee Indians had not responded. At the August 2019 six-month review hearing, the court found ICWA did not apply.

The court's next ICWA related findings, entered November 13, 2019 after Father's contest of the six-month review hearing, stated, "The Court has read and considered the documents submitted by the Department, including notice sent to the applicable tribe(s) and the BIA and responses received; [¶] There is currently insufficient information to determine if the children may be Indian children; [¶] The Indian Child Welfare Act does not [ ] apply to this case."

All subsequent filings by the Department in this matter contain the statement that the court had found on November 13, 2019 that ICWA did not apply, and no additional information

26

indicated otherwise.  The section 366.26 hearing and orders did not discuss ICWA compliance.

### B. ICWA Compliance

"ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions." (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1396.)  "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subds. (a), (b).)

"ICWA established minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (*D.S.*).)  As relevant here, "section 224.2 creates three distinct duties regarding ICWA in dependency proceedings." (*Id.* at p. 1052.)  After a child welfare department's initial contact with the minor and his or her family, "the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child.  (§ 224.2, subds. (a), (b).)  Second, if that initial inquiry creates a 'reason to believe' the child is an Indian child, then the [Department] 'shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e) . . . .)  Third, if that further inquiry results in a reason to know the child is an Indian child, then the formal notice

requirements of section 224.3 apply." (*D.S.*, at p. 1052, italics omitted.)

If the court or social worker "has reason to believe that an Indian child is involved . . . but does not have sufficient information to determine that there is reason to know that the child is an Indian child, the court . . . [or] social worker . . . shall make further inquiry regarding the possible Indian status of the child." (§ 224.2, subd. (e).) When there is "reason to believe" the child is an Indian child, "further inquiry is necessary." (§ 224.2, subd. (e)(2).) It includes "[i]nterviewing the parents . . . and extended family members" to gather specified information, contacting the Bureau of Indian Affairs (BIA), the State Department of Social Services, and "the tribe or tribes . . . that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(A)–(C); Cal. Rules of Court, rule 5.481(a)(4).)

If, based on this further inquiry, there is "reason to know" the child is an Indian child, then more formal ICWA notice is required.[6] (§§ 224.2, subds. (d) & (f), 224.3; Cal. Rules of Court,

_____

[6] Formal notice must be given to the minor's parents or legal guardian, Indian custodian, if any, and the child's tribe regarding any hearings that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement. (§ 224.3, subd. (a).) Notice must include "[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of

rule 5.481(b); 25 U.S.C. § 1912(a).) As this statutory scheme makes clear, the duty to provide notice is narrower than the duty of inquiry. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 884.) If, on the other hand, the juvenile court finds that the Department has conducted "proper and adequate further inquiry and due diligence" and that there is no reason to know whether the child is an Indian child, the court may make a finding that ICWA does not apply. (§ 224.2, subds. (g) & (i)(2); *In re Dominic F.* (2020) 55 Cal.App.5th 558, 570–571.) The Department and the court, however, have a continuing duty under ICWA, and the court "shall reverse its determination if it subsequently receives information providing reason to believe that the child is an Indian child and order the social worker or probation officer to conduct further inquiry . . . ." (§ 224.2, subds. (a) & (i)(2); see *D.S.*, *supra*, 46 Cal.App.5th at p. 1050.)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*D.S.*, *supra*, 46 Cal.App.5th at p. 1051.)

Here, the parties agree that the Department's duty of further inquiry was triggered after Father submitted an ICWA-020 form indicating he may have Cherokee ancestry on the paternal side from a great-great grandmother and after he told

---

other direct lineal ancestors of the child, and any other identifying information, if known." (§ 224.3, subd. (a)(5)(C).)

the Department in January 2019 that he may have Cherokee ancestry. (See *In re A.M.* (2020) 47 Cal.App.5th 303, 322 [a mother's "statement that she was told and believed that she may have Indian ancestry with the Blackfeet and Cherokee tribes" and listing her grandfather "as having possible Indian heritage" were sufficient to trigger the duty of further inquiry].) The Department's jurisdiction/disposition report states that "[t]he Department is engaged in research efforts around [Father's] ancestry." The record subsequently reflects that the Department sent ICWA-030 notices on February 7, 2019, but they listed only Father's information on the paternal side. The Department concedes that "the record is simply unclear as to whether th[e] duty [of further inquiry] was performed." Notably, the record provides no evidence that the Department asked Father for relative contact information or engaged in additional research efforts, as it was ordered to do by the juvenile court at the February 28, 2019 combined jurisdiction/disposition hearing, and as it was required to do by statute. (§§ 224.2, subd. (e)(2)(A)–(C), 224.3, subd. (a)(5)(C) [requiring, among other things, that the social worker interview parents about names, addresses, birth dates of biological parents, grandparents, and great-grandparents, or Indian custodians].) Thus, the juvenile court's implied findings of further adequate inquiry and of ICWA's resultant inapplicability lack support in the record, and the Department concedes it would be improper to impute such a finding to the orders entered at the section 366.26 hearing.

"[E]rrors in an ICWA notice are subject to review under a harmless error analysis." (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1415.) If we conclude the juvenile court did not comply with the ICWA provisions, we "reverse only if the error is prejudicial." (*In re A.L.* (2015) 243 Cal.App.4th 628, 639.) Here, the Department either did not take sufficient affirmative steps to investigate the children's possible Indian ancestry or did not document its efforts to do so, and the juvenile court failed to ensure that an adequate investigation had been conducted. The Department does not argue harmless error. We note that the Department's jurisdictional/disposition report stated Father was removed from his mother at an early age, and he reported having no natural supports, so it is possible he had no identifying or contact information for his extended family. On the other hand, the same report indicated that Father preferred the children be placed with the state rather than Mother or his family, indicating that he may be in contact with them. On this record, and in the absence of evidence that the Department fulfilled its duty of further inquiry, we cannot say the Department's ICWA non-compliance was harmless. Accordingly, we will conditionally reverse the order terminating parental rights. (See *In re N.G.* (2018) 27 Cal.App.5th 474, 486 [conditionally reversing judgment terminating parental rights and remanding for court to comply with inquiry and notice provisions of ICWA and sections 224.2 and 224.3].)

## DISPOSITION

The juvenile court's January 8, 2021 order denying Mother's section 388 motion is affirmed.

The juvenile court's January 11, 2021 order terminating Mother's parental rights is reversed and the matter is remanded for the juvenile court to conduct a new section 366.26 hearing consistent with *Caden C.*, *supra*, 11 Cal.5th 614, and the views expressed in this opinion. The parties may introduce such additional relevant evidence as they deem necessary, including but not limited to evidence of the family's current circumstances and any developments that might have occurred during the pendency of this appeal. Prior to holding this hearing, the juvenile court is to comply with the further inquiry and notice provisions of ICWA as set forth below.

The juvenile court's January 11, 2021 order terminating Father's parental rights is conditionally reversed, and the matter is remanded with instructions for the juvenile court to order the Department to comply with the further inquiry provisions under section 224.2, subdivision (e)(2)(C) regarding the children's Cherokee membership status or eligibility. If, after proper further inquiry, the court finds a reason to know the children are Indian children, the court must provide notice in accordance with ICWA. If the court finds that the children are Indian children, then the court must conduct a new section 366.26 hearing and any further proceedings in compliance with ICWA and California law. If the court finds that the children are not Indian children,

the section 366.26 order terminating parental rights shall be reinstated as to Father.


BROWN, J.


WE CONCUR:

POLLAK, P. J.
ROSS, J.*


*In re A.L.*  (A162200)

* Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

33